**EXHIBIT "1"**

1   PETER D. KEISLER
    Assistant Attorney General
2   Civil Division
    United States Department of Justice
3
    EUGENE M. THIROLF
4   Director
    Office of Consumer Litigation
5
    ALAN J. PHELPS
6   D.C. Bar No. 475938
    Trial Attorney
7   Office of Consumer Litigation
    United States Department of Justice
8   1331 Pennsylvania Ave. NW, Suite 950N
    Washington, DC 20004
9   Tel: 202-307-6154
    Fax: 202-514-8742
10  E-mail: alan.phelps@usdoj.gov

11  Attorneys for the United States

12

13                    UNITED STATES DISTRICT COURT

14            FOR THE CENTRAL DISTRICT OF CALIFORNIA

15  HASMIK JASMINE PAPAZIAN,        ) No. CV 07-1479 GPS (RZx)
                                    )
16          Plaintiff,              ) BRIEF OF THE UNITED STATES
                                    ) IN SUPPORT OF 15 U.S.C.
17          v.                      ) § 1681c(q)
                                    )
18  BURBERRY LIMITED, et al.,       )
                                    )
19          Defendants.             ) Honorable George P. Schiavelli
                                    )
20  _____)

21

22

23

24

25

26

27

28  **BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(G) - 1**

1

**TABLE OF CONTENTS**

2

3
INTRODUCTION . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . 4
4
    A.   The requirements of § 1681c(g) are clear . . . . . . 5
5
    B.   Section 1681c(g) does not violate the First Amendment 7
6
CONCLUSION . . . . . . . . . . . . . . . . . . . 21
7

8

**TABLE OF AUTHORITIES**

9

44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484 (1996) . . . 8
10

Aeschbacher v. California Pizza Kitchen, 2007 WL 1500853 (C.D.
11 Cal. Apr. 3, 2007) . . . . . . . . . . . . . . . . 7

12 Arcilla v. Adidas Promotional Retail Operations, Inc., 488 F.
Supp.2d 965, 2007 WL 1498334 (C.D. Cal. May 4, 2007) . . . . . 7
13
Big Bear Super Market No.3 v. INS, 913 F.2d 754 (9th Cir. 1990) 6
14
Bolger v. Youngs Drug Product Corp., 463 U.S. 60 (1983) . . . 11
15
California Teachers Ass'n v. Bd. of Educ., 271 F.3d 1141 (9th
16 Cir. 2001) . . . . . . . . . . . . . . . . . . . 6

17 Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,
447 U.S. 557 (1980) . . . . . . . . . . . . . . . . 11-13
18
City of Dallas v. Stanglin, 490 U.S. 19 (1989) . . . . . . . . 9
19
Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 n. 5
20 (1984) . . . . . . . . . . . . . . . . . . . . . 10

21 Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749
(1985) . . . . . . . . . . . . . . . . . . . . . 10
22
Greater New Orleans Broad. Ass'n v. United States, 527 U.S. 173
23 (1999) . . . . . . . . . . . . . . . . . . . 12, 13

24 Hill v. Colorado, 530 U.S. 703 (2000) . . . . . . . . . . . 5

25 Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group, 515 U.S. 557,
569-70 (1995) . . . . . . . . . . . . . . . . . . 9
26
Lopez v. Gymboree Corp., 2007 WL 1690886 (N.D. Cal., June 9,
27 2007) . . . . . . . . . . . . . . . . . . . . . 7

28 Lorillard Tobacco v. Reilly, 533 U.S. 525 (2001) . . . . 12, 13

**BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(G) - 2**

1

2  <u>Pirian v. In-N-Out Burgers</u>, 2007 WL 1040864 (C.D. Cal. Apr. 5, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 7

3  <u>Rumsfeld v. F.A.I.R.</u>, 547 U.S. 47, 126 S.Ct. 1297 (2006) . . . 9

4  <u>Soualian v. Int'l Coffee & Tea LLC</u>, Case No. CV 07-502-RGK (C.D. Cal., June 11, 2007) . . . . . . . . . . . . . . . . . . 4

5

6  <u>Spence v. Washington</u>, 418 U.S. 405, 410-11 (1974) . . . . . . 9

7  <u>Spikings v. Cost Plus, Inc.</u>, Case No. CV 06-8125-JFW (C.D. Cal. May 25, 2007) . . . . . . . . . . . . . . . . . . . . . . 4

8  <u>Texas v. Johnson</u>, 491 U.S. 397 (1989) . . . . . . . . . . . . 9

9  <u>Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, P. C.</u>, 467 U.S. 138 (1984) . . . . . . . . . . 4

10

11 <u>Trans Union v. FTC</u>, 245 F.3d 809 (D.C. Cir. 2001) . . 8, 12-13

12 <u>Trans Union v. FTC</u>, 267 F.3d 1138 (D.C. Cir. 2001) . . . . 8, 20

13 <u>Turner Broad. System, Inc. v. FCC</u>, 520 U.S. 180, 217-18 (1997) 20

14 <u>United Reporting Pub. Corp. v. California Highway Patrol</u>, 146 F.3d 1133 (9th Cir. 1998) . . . . . . . . . . . . . . . . 11

15 <u>United States v. Powell</u>, 423 U.S. 87 (1975) . . . . . . . . . 6

16 <u>Universal City Studios, Inc. v. Corely</u>, 273 F.3d 429 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

17

18 <u>Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.</u>, 455 U.S. 489 (1982) . . . . . . . . . . . . . . . . . . . . 6

19 <u>Villegas v. City of Gilroy</u>, 484 F.3d 1136 (9th Cir. 2007) . . . 9

20 <u>Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.</u>, 425 U.S. 748 (1976) . . . . . . . . . . . . . 8

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2       Pursuant to 28 U.S.C. § 2403, the United States of America

3  ("United States") hereby submits this brief in defense of Section

4  113 of the Fair and Accurate Credit Transactions Act of 2003

5  ("FACTA") (codified at 15 U.S.C. § 1681c(g)) and against the

6  constitutional challenges presented by Defendant Burberry Limited

7  in the Counterclaim included with Defendants' Answer (Dkt. #10).

8  Section 1681c(g) is neither impermissibly vague nor does it

9  infringe on any First Amendment right.  The United States

10  respectfully requests that the Court find § 1681c(g)

11  constitutional.

12

**ARGUMENT**

13       As an initial matter, the government understands that

14  Plaintiff's motion for class certification also is pending before

15  this Court.  The government does not intervene to take a stand on

16  this issue, but notes that at least two courts in cases exactly

17  like this one ruled against class certification.  See Soualian v.

18  Int'l Coffee & Tea LLC, Case No. CV 07-502-RGK (C.D. Cal., June

19  11, 2007) (available at 2007 U.S. Dist. LEXIS 44208); Spikings v.

20  Cost Plus, Inc., Case No. CV 06-8125-JFW (C.D. Cal. May 25, 2007)

21  (available at 2007 U.S. Dist. LEXIS 44214).  Were this Court to

22  also find against class certification, the case likely would be

23  resolved without the necessity of determining the constitutional

24  questions raised by Defendant.  Therefore, the Court need not

25  reach the constitutional issues at this time, depending on the

26  outcome of the class certification motion.  See Three Affiliated

27  Tribes of Fort Berthold Reservation v. Wold Engineering, P. C.,

28  467 U.S. 138, 157 (1984) ("It is a fundamental rule of judicial

**BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(g) - 4**

1  restraint . . . that this Court will not reach constitutional

2  questions in advance of the necessity of deciding them.").

3  Should the Court determine that resolution of the constitutional

4  questions is presently necessary, however, case law provides

5  ready answers.

6  **A.    The requirements of § 1681c(g) are clear**

7       Section 1681c(g) reads, in relevant part, as follows:

8       (g) Truncation of credit card and debit card numbers.

9
10          (1) In general. Except as otherwise provided
            in this subsection, no person that accepts
11          credit cards or debit cards for the
            transaction of business shall print more than
12          the last 5 digits of the card number or the
            expiration date upon any receipt provided to
13          the cardholder at the point of the sale or
            transaction.

14  15 U.S.C. § 1681c.

15       Defendant asserts that § 1681c(g) is impermissibly vague

16  because it does not specify whether retailers must truncate card

17  numbers *and also* delete expiration dates.  Defendant claims that

18  the statute can reasonably be read to allow printing of a card

19  expiration date so long as the card number itself is truncated.

20  Such a reading ignores the plain language and purpose of the

21  provision.  The statute as written does not offend due process

22  concerns.

23       A statute is unconstitutionally vague only if (1) "it fails

24  to provide people of ordinary intelligence a reasonable

25  opportunity to understand what conduct it prohibits" or (2) "it

26  authorizes or encourages arbitrary and discriminatory

27  enforcement."  Hill v. Colorado, 530 U.S. 703, 732 (2000).  This

28  requirement of a "reasonable" degree of clarity does not mean

**BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(g) - 5**

Congress must use the most precise language conceivable. "The fact that Congress might, without difficulty, have chosen clearer and more precise language equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague." <u>United States v. Powell</u>, 423 U.S. 87, 94 (1975) (quotation omitted).

Furthermore, as the Supreme Court has emphasized, "economic regulation is subject to a less strict vagueness test [than criminal statutes] because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." <u>Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.</u>, 455 U.S. 489, 498 (1982) (footnote omitted); <u>see also</u> <u>Big Bear Super Market No. 3 v. INS</u>, 913 F.2d 754, 757 (9th Cir. 1990) ("when the statute regulates the conduct of businesses . . . the vagueness test is relaxed, because businesses have a greater ability to determine the meaning of legislation in advance of their conduct than do individuals.").

Vagueness concerns are more acute where a statute implicates First Amendment rights. <u>See</u> <u>Hoffman Estates</u>, 455 U.S. at 499. As set out below, the statute at issue does not restrict actual speech protected by the First Amendment. Even if § 1681c(g) applied to true expression, however, "perfect clarity is not required even when a law regulates protected speech." <u>California Teachers Ass'n v. Bd. of Educ.</u>, 271 F.3d 1141, 1150 (9th Cir. 2001) (citing <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 794 (1989)). "[E]ven when a law implicates First Amendment rights,

1  the constitution must tolerate a certain amount of vagueness."

2  Id. at 1151.

3      Section 1681c(g) easily passes muster under either vagueness

4  test because no reasonable person would read the statute in any

5  way other than prohibiting the printing on receipts of both

6  expiration dates and full card numbers.  Read in the unreasonable

7  manner Defendant suggests, § 1681c(g) would allow retailers to

8  print full credit/debit card numbers so long as they did not

9  print the expiration date.  Def.'s Mem. in Opp'n. to Pl.'s Mot.

10  to Dismiss, Dkt. # 21 ("Def.'s Br.") at 4.  Congress could not

11  have intended that absurd result.  Indeed, at least four courts

12  have recently found, in the context of motions to dismiss brought

13  in cases mirroring the present action, that § 1681c(g) clearly

14  prohibits printing expiration dates.  See Lopez v. Gymboree

15  Corp., 2007 WL 1690886, *3 (N.D. Cal., June 9, 2007); Arcilla v.

16  Adidas Promotional Retail Operations, Inc., 488 F. Supp.2d 965,

17  2007 WL 1498334, *3-5 (C.D. Cal. May 4, 2007); Pirian v. In-N-Out

18  Burgers, 2007 WL 1040864, *3 (C.D. Cal. Apr. 5, 2007);

19  Aeschbacher v. California Pizza Kitchen, 2007 WL 1500853, *3

20  (C.D. Cal. Apr. 3, 2007).  Those courts were correct; the

21  argument advanced by Defendant has no merit.

22  **B.   Section 1681c(g) does not violate the First Amendment**

23      Defendant's First Amendment claim is similarly unconvincing.

24  First, it is highly questionable whether Defendant's procedure of

25  copying card expiration dates and numbers to cash register

26  receipts constitutes speech at all.  Second, even if the act of

27  transferring expiration dates to paper involves expressive

28

**BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(g) - 7**

1  speech, the government's restriction on that speech is extremely

2  limited, reasonable, and constitutional.

3      Accepting a credit/debit card from a customer, copying the

4  card number or expiration date onto a receipt, and immediately

5  handing the card with receipt back to the customer is a rote act

6  devoid of expression and not "speech" covered by the First

7  Amendment.  Defendant attempts to liken printing expiration dates

8  to commercial advertisements, instructions, or computer code.

9  Def.'s Br. at 8-9.  While it is true that dry facts in

10 advertisements or instructions such as computer code can

11 constitute speech, that is not the situation here.  All of the

12 cases Defendant cites involve statements laden with actual

13 information flowing from one party to another.  <u>See</u> <u>44</u>

14 <u>Liquormart, Inc. v. Rhode Island</u>, 517 U.S. 484 (1996) (liquor

15 store advertisements); <u>Virginia State Bd. of Pharmacy v. Virginia</u>

16 <u>Citizens Consumer Council, Inc.</u>, 425 U.S. 748 (1976) (pharmacy

17 drug prices); <u>Universal City Studios, Inc. v. Corely</u>, 273 F.3d

18 429 (2d Cir. 2001) (computer code).  Defendant's actions involve

19 no such expression of information; rather, the "speech" at issue

20 is more akin to the act of putting a credit card on a photocopy

21 machine and pressing the button.[1]  The fact that Defendant's

22 conduct results in a printed date does not, by itself, implicate

23 the First Amendment.  "[I]t has never been deemed an abridgment

24

25      [1]  As discussed below, courts have applied commercial speech
   analysis in the context of other FCRA provisions.  <u>See</u> <u>Trans</u>
26 <u>Union v. FTC</u>, 245 F.3d 809 (D.C. Cir. 2001); <u>Trans Union v. FTC</u>,
   267 F.3d 1138 (D.C. Cir. 2001).  In these cases, however, the
27 communications at issue involved far more than simply copying a
   date from a card to a piece of paper.  Rather, these cases
28 concerned the sale of mailing lists containing contact
   information for consumers who met specific criteria.

**BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(g) - 8**

of freedom of speech or press to make a course of conduct illegal
merely because the conduct was in part initiated, evidenced, or
carried out by means of language, either spoken, written, or
printed." Rumsfeld v. Forum for Academic and Institutional
Rights, Inc., 547 U.S. 47, 126 S.Ct. 1297, 1308 (2006) (quotation
omitted).

Conduct can constitute speech, but only if it involves
expression. For good reason, not all conduct qualifies for First
Amendment protection. "It is possible to find some kernel of
expression in almost every activity a person undertakes – for
example, walking down the street, or meeting one's friends at a
shopping mall – but such a kernel is not sufficient to bring the
activity within the protection of the First Amendment." City of
Dallas v. Stanglin, 490 U.S. 19, 25-26 (1989) (law imposing age
limits on dance halls did not violate First Amendment freedom of
association). Communicative, constitutionally protected conduct
requires an intent to convey a particularized message that is
likely to be understood by those viewing it. See Spence v.
Washington, 418 U.S. 405, 410-11 (1974) (flying flag upside down
found expressive); see also Hurley v. Irish-Am. Gay, Lesbian &
Bisexual Group, 515 U.S. 557, 569-70 (1995) (discussing instances
in which the Supreme Court has found conduct to be inherently
communicative); Texas v. Johnson, 491 U.S. 397, 404 (1989)
(burning of flag found expressive); Villegas v. City of Gilroy,
484 F.3d 1136, 1139-41 (9th Cir. 2007) (wearing of vests with
skull insignia signifying no particular message found not
expressive). Furthermore, it is the duty of the party seeking to
engage in allegedly expressive conduct to demonstrate that the

**BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(G) - 9**

1  First Amendment applies to that conduct.  <u>Clark v. Cmty. for</u>

2  <u>Creative Non-Violence</u>, 468 U.S. 288, 293 n. 5 (1984) ("Although

3  it is common to place the burden upon the Government to justify

4  impingements on First Amendment interests, it is the obligation

5  of the person desiring to engage in assertedly expressive conduct

6  to demonstrate that the First Amendment even applies.").

7  Defendant offers no plausible argument that copying a date

8  already in the possession of a customer from one place to another

9  is an inherently expressive activity.  It fact, such an action

10 communicates nothing in particular.

11     Even if Defendant could make a case that copying a date from

12 plastic to paper constitutes actual expressive speech, it would

13 be considered, at best, commercial speech.  <u>See</u> <u>Trans Union v.</u>

14 <u>FTC</u>, 295 F.3d 42, 52-53 (D.C. Cir. 2002) (upholding a different

15 section of the FCRA and analyzing it under the commercial speech

16 doctrine).  The Supreme Court has "long recognized that not all

17 speech is of equal First Amendment importance.  It is speech on

18 matters of public concern that is at the heart of the First

19 Amendment's protection."  <u>Dun & Bradstreet, Inc. v. Greenmoss</u>

20 <u>Builders, Inc.</u>, 472 U.S. 749, 758-59 (1985) (quotations omitted).

21 In particular, "[commercial speech] may be regulated in ways that

22 might be impermissible in the realm of noncommercial expression."

23 <u>Id.</u> at 759 n.5 (citations omitted).

24     Defendant contends that because expiration dates are not

25 advertisements and do not refer to specific products, they cannot

26 be considered commercial speech.  Def.'s Br. at 7, n.4.

27 Therefore, Defendant claims, printing expiration dates on

28 receipts actually deserves *greater* First Amendment scrutiny than

**BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(g) - 10**

1  advertisements.  <u>Id.</u>  Defendant relies for this proposition on

2  the discussion of commercial speech in <u>Bolger v. Youngs Drug</u>

3  <u>Product Corp.</u>, 463 U.S. 60 (1983), which found that such speech

4  often constitutes advertising in some form, references a

5  particular product, and is motivated by economic considerations.

6  <u>Bolger</u>, 463 U.S. 67-68.

7      Contrary to Defendant's argument, commercial speech is not

8  limited to advertisements for specific products, under <u>Bolger</u> or

9  any other case.  As the Ninth Circuit has held, whether something

10  constitutes advertising "is the beginning of our inquiry . . .

11  not the end."  <u>United Reporting Pub. Corp. v. California Highway</u>

12  <u>Patrol</u>, 146 F.3d 1133, 1137 (9th Cir. 1998) (<u>rev'd. on other</u>

13  <u>grounds</u>, <u>Los Angeles Police Dept. v. United Reporting Pub. Corp.</u>,

14  528 U.S. 32 (1999)).  The <u>Bolger</u> Court itself explicitly stated

15  that commercial speech does not require "each of the

16  characteristics present in this case."  <u>Bolger</u>, 463 U.S. at 67

17  n.14.  In the seminal <u>Central Hudson</u> case, decided just a few

18  years prior to <u>Bolger</u>, the Supreme Court noted that commercial

19  speech can include any "expression related solely to the economic

20  interests of the speaker and its audience."  <u>Central Hudson Gas &</u>

21  <u>Electric Corp. v. Public Service Comm'n of New York</u>, 447 U.S.

22  557, 561 (1980).

23      The <u>Central Hudson</u> definition is far more broad than the one

24  Defendant attempts to impose through its misreading of <u>Bolger</u>.

25  It covers the "speech" at issue, which, even as Defendant

26  describes it, does nothing more than confirm details of a

27  private, commercial transaction.  <u>See</u> Def.'s Answer and

28  Counterclaim (Dkt. #10) ¶ 40 (printing of expiration date meant

**BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(g) - 11**

1   to "confirm to [Defendant's] customers that a transaction has

2   been appropriately charged.").  Such a communication relates only

3   to the economic interests of the merchant and the consumer.  It

4   does not touch on any matter of public concern.  It constitutes,

5   if anything, commercial speech.

6        Under <u>Central Hudson</u>'s intermediate scrutiny test, the Court

7   must examine whether 1) the speech concerns lawful activity and

8   is not misleading; 2) the asserted government interest is

9   substantial; 3) the regulation directly serves that interest; and

10  4) the regulation is no more extensive than necessary to serve

11  that interest.  <u>Central Hudson</u>, 447 U.S. at 566.  Elaborating on

12  the last factor, the Supreme Court has made clear that "[t]he

13  Government is not required to employ the least restrictive means

14  conceivable, but it must demonstrate narrow tailoring of the

15  challenged regulation to the asserted interest – 'a fit that is

16  not necessarily perfect, but reasonable; that represents not

17  necessarily the single best disposition but one whose scope is in

18  proportion to the interest served.'"  <u>Greater New Orleans Broad.</u>

19  <u>Ass'n v. United States</u>, 527 U.S. 173, 188 (1999) (quoting <u>Board</u>

20  <u>of Trustees of State Univ. of N. Y. v. Fox</u>, 492 U.S. 469, 480

21  (1989)); <u>Lorillard Tobacco Co. v. Reilly</u>, 533 U.S. 525, 556

22  (2001) (explicitly stating that case law does not require "the

23  least restrictive means," but only a "reasonable fit."); <u>see also</u>

24  <u>Trans Union v. FTC</u>, 245 F.3d 809, 818-19 (D.C. Cir. 2001)

25  ("Because the FCRA is not subject to strict First Amendment

26  scrutiny . . . Congress had no obligation to choose the least

27  restrictive means of accomplishing its goal.").  Furthermore,

28  while the commercial speech test requires more than "mere

1  speculation or conjecture" that the restriction advances the

2  government interest, <u>Greater New Orleans</u>, <u>supra</u>, at 188, neither

3  does it require "a surfeit of background information." <u>Lorillard</u>

4  <u>Tobacco</u>, 533 U.S. at 555.  The means used to achieve a

5  permissible goal can be justified "solely on history, consensus,

6  and 'simple common sense.'" <u>Id.</u> (quoting <u>Florida Bar v. Went For</u>

7  <u>It, Inc.</u>, 515 U.S. 618, 628 (1995)).

8      The facts of this case meet the first prong of the <u>Central</u>

9  <u>Hudson</u> test, in that copying expiration dates is not misleading

10  and concerns otherwise lawful transactions.  Regarding the second

11  prong, Defendant does not, and can not, deny the government's

12  significant interest in preventing identity theft.  <u>See</u> Def.

13  Answer at ¶ 42 ("Congressional concern about identity theft was

14  valid."); <u>Trans Union</u>, 245 F.3d at 818 (governmental interest in

15  "protecting the privacy of consumer credit information . . . is

16  substantial.").  The dispute, therefore, centers on the third and

17  fourth prongs of <u>Central Hudson</u>, and specifically Defendant's

18  assertion that the combination of an expiration date and a

19  truncated card number cannot possibly be used to facilitate the

20  type of fraud Congress wanted to prevent.

21      Congress sought with FACTA to "assist[] consumers in

22  preventing identity theft and for mitigating its consequences

23  once the crime has occurred." <u>See</u> 108 H. Rep. No. 263 (2003).

24  The goal of the provision that became § 1681c(g) was to "limit

25  the opportunities for identity thieves to 'pick off' key card

26  account information." S. Rep. No. 108-166 (2003).  FACTA

27  followed enactment of laws in at least 20 states with provisions

28  similar to § 1681c(g) that prohibited printing the full card

**BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(g) - 13**

number as well as the expiration date on receipts.[2]  A handful of other states passed laws focused only on the card number.[3]  As shown by the final language of § 1681c(g), Congress mandated the more comprehensive version of these restrictions as the national standard.  Congress' decision to protect both card numbers and expiration dates from inadvertent disclosure through discarded sales receipts, as many states had already done, directly serves the interest Congress sought to protect through the least restrictive means available.

Defendant claims that expiration dates accompanied only by truncated card numbers need no protection from would-be fraudsters.  Defendant submitted with its opposition to Plaintiff's motion the declaration of a former MasterCard employee who stated that a full expiration date and a truncated card number cannot be used to make fraudulent transactions. Decl. of Joel Lisker, Dkt. #22.  Defendant also contends, based

---

[2]  See Ariz. Rev. Stat. Ann. § 44-1367 (2001); Ark. Code Ann. § 4-107-303  (West 2003); Cal. Civ. Code § 1747.09 (West 2007); Colo. Rev. Stat. Ann. § 6-1-711 (West 2006); Conn. Gen. Stat. Ann. § 42-133hh (West 2003); Fla. Stat. Ann. § 501.0188 (West 2003); Ga. Code Ann. § 10-15-3 (2007); Idaho Code Ann. § 28-51-103 (2003); 815 Ill. Comp. Stat. Ann. 505/2mm (West 2004); Kan. Stat. Ann. § 50-669b (2002); La. Rev. Stat. Ann. § 9:3518.3 (2001); Me. Rev. Stat. Ann. Tit. 10, § 1149 (2004); Nev. Rev. Stat. Ann. § 597.945 (West 2003); N.J. Stat. Ann. § 56:11-42 (West 2002); N.Y. Gen. Bus. Law § 520-a (McKinney 2003); N.D. Cent. Code § 51-07-27; Ohio Rev. Code Ann. § 1348.18 (West 2002); Okla. Stat. Ann. Tit. 15, § 752a (West 2002); Tex. Bus. & Com. Code Ann. § 35.61 (Vernon 2003); Utah Code Ann. § 13-38-101 (West 2003); Va. Code Ann. § 11-33.2 (West 2004); Wash. Rev. Code Ann. § 19.200.010 (West 2000).

[3]  See Del. Code Ann. Tit. 11, § 915a (2003); Md. Code Ann., Commercial Law § 14-1318 (West 2003); Mo. Ann. Stat. § 407-433 (West 2003); Neb. Rev. Stat. § 28-633 (2002); N.m. Stat. Ann. § 56-4-3.1 (West 2003); N.c. Gen. Stat. Ann. § 14-113.24 (West 2003); Or. Rev. Stat. Ann. § 646.888 (West 2007); Wis. Stat. Ann. § 134.74 (West 2002).

**BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(g) - 14**

1 on the same declaration, that card companies routinely complete

2 transactions with incorrect expiration dates so long as the

3 expiration date provided to the merchant is in the future.

4 Def.'s Br. at 3.  Therefore, Defendant claims, a restriction on

5 copying expiration dates to sales slips does not advance the

6 government's interest in preventing identity theft and other

7 fraud.

8      Defendant's argument that a thief would not be able to make

9 fraudulent charges using <u>only</u> a truncated card number and the

10 full expiration date misses the point.  Thieves might piece

11 together (or "pick off," in the words of Congress) different bits

12 of information from different sources.  The expiration date of a

13 customer's credit/debit card, until recently printed on

14 Defendant's receipts, is one of several pieces of information

15 that can make it easier for criminals to rack up fraudulent

16 charges.  These dates are worth protecting even when not

17 accompanied by other important financial information.[4]

18      Congress' actions comport with common experience, testimony

19 provided in support of the legislation, and the instructions

---

21     [4]  Mr. Lisker also opines that an identity thief who
obtained information such as a victim's Social Security number
22 could open accounts under the victim's name and make fraudulent
charges to those new accounts.  Expiration dates of existing,
23 legitimate cards may not be pertinent to someone creating new,
fraudulent accounts from scratch.  However, the constitutionality
24 of § 1681c(g) does not require that the provision help fight <u>all</u>
types of fraud.
25     Mr. Lisker further argues that consumers suffer little or no
damage from unauthorized use of their credit cards because of
26 laws and policies limiting their liability.  Even if victims
themselves rarely incur any direct monetary loss due to credit
27 card fraud, such losses are paid by consumers everywhere in the
form of higher bank fees or in the costs for goods and services.
28 Consumer victims also spend valuable time reporting and otherwise
dealing with this type of fraud.

**BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(g) - 15**

1   credit card companies give to merchants.  For instance, Mari J.

2   Frank, author of a declaration cited in Mr. Lisker's declaration,

3   testified to Congress that expiration dates <u>should</u> be eliminated

4   from sales receipts.  On May 15, 2003, Ms. Frank advocated for a

5   rule stating that "[n]o company or entity shall print more than

6   the last 5 digits of a credit card number or account number <u>or</u>

7   <u>the expiration date</u> upon any receipt provided to a cardholder."

8   <u>See</u> Testimony of Mari J. Frank, May 15, 2003, before the House

9   Gov't. Reform Comm. (available at 2003 WL 21130287) (emphasis

10  added).  Ms. Frank was not alone in pressing Congress to protect

11  expiration dates.  Michael D. Cunningham, Senior Vice President

12  of Credit and Fraud Operations for Chase Cardmember Services,

13  testified before the Senate Banking Committee in 2003 that much

14  of the fraud his company encountered occurred when a card

15  "account number and expiration date is compromised[,] permitting

16  purchases by phone, mail, or Internet."  <u>See</u> S. Hrg. 108-579,

17  June 19, 2003, before the Senate Comm. on Banking, Housing, and

18  Urban Affairs.  Linda Foley, Executive Director of the Identity

19  Theft Resource Center, recommended that Congress require

20  businesses to print only truncated card numbers and no expiration

21  dates on receipts.  <u>Id.</u>

22      Anyone who has used a credit or debit card for telephone or

23  online transactions knows that retailers, especially those

24  accepting orders over the phone or through the Internet, require

25  expiration dates to complete transactions.  That common

26  experience is borne out by the policies of credit card companies.

27  For example, VISA publishes a handout for merchants entitled "If

28

1  the Card is NOT There – You Need to be MORE Aware."  That

2  document instructs merchants to:

3      Ask the customer for the card expiration date and
       include it in your authorization request.  An invalid
4      or missing expiration date can be an indicator that the
       person on the other end does not have the actual card
5      in hand.

6  Ex. A.[5]  In another publication called "Rules for VISA

7  Merchants," VISA again states, in a section entitled "Fraud

8  Prevention Guidelines for Card-Not-Present Transactions,"  that

9  businesses should:

10      Whenever possible, . . . ask customers for their card
        expiration, or "Good Thru," date and include it in
11      [the] authorization requests.  Including the date helps
        to verify that the card and transaction are legitimate.
12      A [mail order/telephone order] or Internet order
        containing an invalid or missing expiration date may
13      indicate counterfeit or unauthorized use.

14  Ex. B (excerpts from VISA Rules) at 32 (emphasis added).[6]  Those

15  same Rules further state:

16      Key-entered transactions are fully acceptable, but they
        are associated with higher fraud and chargebacks rates.
17      In addition, when transactions are key-entered, the
        benefits associated with special security features –
18      such as the expiration date and Card Verification Value
        2 (CVV2) – are not available.

19
    Rules, p. 31 (emphasis added).[7]
20

21  _____

22      [5]  Available at
    http://usa.visa.com/download/merchants/card_not_there_aware.pdf.

23      [6]  Available at
    http://usa.visa.com/download/merchants/rules_for_visa_merchants.p
24  df.

25      [7]  In her declaration, Ms. Frank quotes another section of
    the "Rules for Merchants" document for the proposition that all
26  expiration dates are automatically considered correct in
    telephone, mail, or Internet transactions.  See Frank Decl. (Dkt.
27  #22, Ex. B) at 5.  However, the page from which Ms. Frank quotes
    deals with chargeback "Code 73: Expired Card" and specifies that
28  "[m]any Merchant Banks automatically handle this type of
    chargeback, so you never really see it."  Id. at 103.  A

1    Other credit card companies similarly advise merchants to

2  verify expiration dates as a way of helping to prevent fraud.

3  Ms. Frank's declaration quotes a "financial crimes expert" with

4  American Express as stating that "60% of the time the expiration

5  date is not evaluated for verification purposes."  Frank Decl.

6  (Dkt. #22, Ex. B) at 14.  In other words, according to the

7  documents submitted by Defendant, the expiration date <u>is</u>

8  evaluated for verification purposes in almost half of American

9  Express transactions.  The "Fraud Prevention Handbook," provided

10 to merchants by American Express, verifies that merchants should

11 obtain the expiration date, especially for "card-not-present"

12 transactions:

13       When you are accepting an American Express Card for
         mail, telephone or Internet transactions, obtain the
14       Cardmember's:

15            1. Name exactly as it appears on the Card
              2. Card account number
16            3. Expiration date on the Card (valid date) . . .

17
         Call American Express Authorizations . . . to verify
18       the billing address and CID.  Address verification must
         be done for charges when merchandise will be shipped.
19       Provide:

20            – Cardmember account number
              – Expiration date . . . .
21

22

23

24 ─────────────────────
   chargeback occurs when a transaction is reversed and cancelled.
25 This section of the "Rules" does not support the broad conclusion
   Ms. Frank draws from it.
26      Furthermore, as stated elsewhere in its Rules for Merchants,
   VISA does consider expiration dates to be one way to help verify
27 legitimate transactions.  The statements of VISA's Joseph Majka,
   as related in Ms. Frank's declaration, do not address the issue
28 of whether expiration dates are sometimes used to help verify
   transactions as legitimate.  <u>See</u> Frank Decl. at 8.

Ex. C (Excerpts from American Express "Handbook") at 38.[8]
American Express also urges merchants not to print expiration
dates on receipts in order to protect that information against
fraud:

> As an American Express merchant, you are responsible
> for helping to ensure that your customer's credit card
> information is secured and protected against future
> fraud activity.  Here are a few steps that you can take
> to protect this information:
>
> . . . <u>Do not print the Card expiration date</u> or your merchant
> account number on the terminal (customer) receipt.  Only
> print a "subset" of the Card account numbers on the terminal
> (customer) receipt.

<u>Id.</u> at 39 (emphasis added).

The company that manages the Discover Card also requests
that merchants obtain expiration dates when processing online or
over-the-phone orders.  <u>See</u> Ex. D at 41.[9]  In an online document
entitled "Fraud Prevention/Card Not Present," Discover explains
to merchants that the "Types of Suspicious Behavior" potentially
indicative of fraud includes when a "[c]ustomer instructs you to
<u>try different expiration dates when initial attempts fail</u>."  Ex.
E (emphasis added) at 44.[10]

As illustrated by these instructions from credit card
companies to merchants, expiration dates should be used to
evaluate the legitimacy of  transactions.  If a customer provides

---

[8]   Available at
https://www209.americanexpress.com/merchant/singlevoice/resources
/FPHANDcvr.pdf.

[9]   Available at
http://www.discovernetwork.com/home/data/fraud_faq.html.

[10]   Available at
http://www.discovernetwork.com/resources/data/card_not_present.ht
ml.

an expiration date that does not match the true date, the
authorization may fail.  Expiration dates may not be examined in
every case; the thoroughness of the verification process is
determined to a large extent by individual merchants, their
banks, and the customer's card issuer.  But expiration dates
plainly are not extraneous information, as Defendant suggests.
Checking expiration dates and protecting them from casual
disclosure is one method that credit card companies, banks, and
merchants employ to prevent fraud.  See Decl. of Don Coker
(submitted with Pl.'s Reply to Def.'s Opp'n. to Pl.'s Mot. to
Dismiss Counterclaim) at ¶ 14 (purchase declined at online
retailer due to invalid expiration date).  Even if that does not
happen in every single case, intermediate scrutiny does not
obligate courts to invalidate a "remedial scheme because some
alternative solution is marginally less intrusive on a speaker's
First Amendment interests."  Turner Broad. System, Inc. v. FCC,
520 U.S. 180, 217-18 (1997) (citations omitted).  "So long as the
means chosen are not substantially broader than necessary to
achieve the government's interest, . . . [a] regulation [is] not
. . . invalid simply because a court concludes that the
government's interest could be adequately served by some
less-speech-restrictive alternative."  Id. at 218 (quotation
omitted).

    Here, Congress reasonably determined that expiration dates
should be protected, and that conclusion led directly to the
extremely limited restriction on the "speech" embodied by
§ 1681c(g).  "[T]he government cannot promote its interest
(protection of personal financial data) except by regulating

**BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(g) - 20**

1  speech because the speech itself (dissemination of financial

2  data) causes the very harm the government seeks to prevent."

3  <u>Trans Union v. FTC</u>, 267 F.3d 1138, 1141 (D.C. Cir. 2001).  The

4  restriction, in other words, directly serves the government's

5  interest by means no more restrictive than necessary.  In fact,

6  the prohibition affects no other speech whatsoever, either

7  indirectly or unintentionally.  It does not even prevent

8  Defendant from doing what it claims to do by printing such

9  information:  Customers can confirm that transactions were

10  properly charged by looking at the truncated card number and

11  other information on the receipt, without the expiration date.

12  In any calculation of the costs and benefits of § 1681c(g), the

13  "cost" column would have to be set at zero.  It easily passes the

14  <u>Central Hudson</u> test.

15                          **CONCLUSION**

16      Section 1681c(g) directly advances the government's

17  legitimate interest in preventing identity theft and related

18  fraud by means that are as narrowly tailored as possible.

19  Furthermore, the terms of the statute are clear.  The United

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

**BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(g) - 21**

1 | States asks that this Court find the provision constitutional, if

2 | it determines that it must reach the constitutional question at

3 | all.

4

5 |                               Respectfully submitted,

6 |                               PETER D. KEISLER
                                  Assistant Attorney General
7 |                               Civil Division
                                  United States Department of Justice

8

9 |                               EUGENE M. THIROLF
                                  Director
10 |                              Office of Consumer Litigation

11 | Dated: July 24, 2007

12 |                              ALAN J. PHELPS
                                  Office of Consumer Litigation
13 |                              U.S. Department of Justice
                                  1331 Penn. Ave. NW Suite 950N
14 |                              Washington, DC 20004

15 |                              Attorneys for the United States

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Brief of the United States in Support of 15 U.S.C. § 1681c(g) was sent via electronic mail and facsimile this 24th day of July, 2007, to the following:

> Camille E. Bennett
> Harold C. Hirshman
> Sonnenschein Nath & Rosenthal
> 7800 Sears Tower
> Chicago, IL 60606
> fax: (312) 876-7934
>
> David H. Stern
> Sonnenschein Nath & Rosenthal
> 601 S. Figueroa St., Ste. 1500
> Los Angeles, CA 90017-5704
> fax: (213) 623-9924
>
> Attorneys for Defendants
>
> Launa Nicole Everman
> Wayne S. Kreger
> Milstein Adelman and Kreger
> 2800 Donald Douglas Loop North
> Santa Monica, CA 90405
> fax: (310) 396-9635
>
> Attorneys for Plaintiff

Alan J. Phelps
Trial Attorney

# Exhibit A





**With the proper know-how and the right tools, mail order, telephone and Internet merchants can detect fraud and avoid associated card losses.**

# If the Card is NOT There — You Need to be MORE Aware

**To stay ahead of the crooks and reduce your fraud exposure:**

1. **Ask the customer** for the card expiration date and include it in your authorization request. An invalid or missing expiration date can be an indicator that the person on the other end does not have the actual card in hand.

2. **Use fraud detection** tools like the Address Verification Service (AVS) and Card Verification Value 2 (CVV2) as part of the authorization process. To order the Merchant Guide to AVS (VRM 01.01.06) or the Merchant Guide to CVV2 (VRM 03.14.06) call 1-800-VISA-311 or visit **www.visa.com/merchant**.

3. **Be on the lookout** for questionable transaction data or other signs indicating "out of pattern" orders.

**If you suspect fraud:**

- **Ask the customer** for day/ evening phone numbers, then call the customer with any questions.

- **Ask for additional information** (e.g., bank name on the front of card).

- **Separately confirm the order** by sending a note via the customer's billing address, rather than the "ship to" address.

## Report suspicious activity to your merchant bank.

VRM 12.05.06    © 2007  Visa U.S.A. Inc.

# Exhibit B



# Rules for Visa Merchants

Card Acceptance and Chargeback
Management Guidelines





**VisaNet**® is part of Visa's consumer payment system. It is itself a collection of systems that includes:

- **An authorization service** through which issuers can approve or decline individual Visa card transactions.

- **A clearing and settlement service** that processes transactions electronically between merchant banks and issuers to ensure that:

  – Visa transaction information moves from merchant banks to issuers for posting to cardholders' accounts.

  – Payment for Visa transactions moves from issuers to merchant banks to be credited to the merchant's account.

## Transaction Life Cycles

The following illustrations show the life cycle for Visa card transactions, for both card-present and card-not-present purchases. Processing events and activities may vary slightly for any one merchant, merchant bank, or card issuer, depending on card and transaction type, and the processing system used.

### Authorization



**1. Cardholder** presents a Visa card to pay for purchases. For card-not-present transactions, the cardholder provides the merchant with the account number, expiration date, billing address, and CVV2.

**2. Merchant** swipes the card, enters the dollar amount, and transmits an authorization request to the merchant bank. For card-not-present transactions, the account number and other information may be digitally or key-entered.

**3. Merchant bank** electronically sends the authorization request to VisaNet.

**4. VisaNet** passes on the request to the card issuer.

**5. Card issuer** approves or declines the transaction.

**6. VisaNet** forwards the card issuer's authorization response to the merchant bank.

**7. Merchant bank** forwards the response to the merchant.

**8. Merchant** receives the authorization response and completes the transaction accordingly.

©2006 Visa U.S.A. Inc. all rights reserved. to be used solely for the purpose of providing Visa Card acceptance services as authorized pursuant to agreement with a Visa member financial institution.

→ SECTION

## Clearing and Settlement



**9. Merchant** deposits the transaction receipt with merchant bank.*

**10. Merchant** bank credits the merchant's account and electronically submits the transaction to Visa for settlement.

**VisaNet:**

- facilitates settlement.

- pays the merchant bank and debits the card issuer account, then sends the transaction to the card issuer.

**Card issuer:**

- posts the transaction to the cardholder account.

- sends the monthly statement to the cardholder.

**13. Cardholder** receives the statement.

*Merchants or their agents that store, process, or transmit data may not store sensitive authentication data (full magnetic-stripe or chip) contents. Card Verification Value 2 (CVV2), or PIN Verification Value (PVV)—even if it is encrypted. Once an authorization is processed, such data should no longer exist. The only components of the magnetic stripe that can be stored are name, account number, and expiration date.

Rules for Visa Merchants—Card Acceptance and Chargeback Management Guidelines
©2006 Visa U.S.A. Inc., all rights reserved, to be used solely for the purpose of providing Visa Card acceptance services as authorized pursuant to agreement with a Visa member financial institution.

## DCC Transaction Receipt Requirements

For both a card-present or card-not-present environment, a DCC transaction must contain all of the following:

- Transaction amount of the goods or services purchased in the merchant's local currency—including currency symbol next to the amount

- Exchange rate, including any commission

- Total price in the transaction currency, accompanied by the words "Transaction Currency"—including currency symbol next to the amount

- A disclaimer that:
  - is easily visible to the cardholder,
  - specifies that the cardholder has been offered a choice of payment in the merchant's local currency, and that the cardholder understands the choice of currency is final



**Fashion Store**
**Location**
**Date and Time**

| | |
|---|---|
| Merchant ID | xxxxx |
| Terminal ID | xxxxx |
| Date: | Time: |
| Invoice No: | Auth No: |
| VISA | SALE |
| Card No | xxxxxxxxxxx6330 |
| Exp. Date | xx/xx |
| Sale Amount | 100   Merchant Currency |
| Tax | 2 |
| Total Amount | 102   Merchant Currency |

Exchange Rate:

+ Commission: xx.xx

| | | |
|---|---|---|
| Sale Amount | $    65 | Transaction Currency |

I accept that I have been offered a choice of currencies for payment & that this choice is final.

Signature: _____

*Truncated Account Number*
*Visa requires that all new electronic POS terminals provide account number truncation on transaction receipts. This means that only the last four digits of an account number should be printed on the customer's copy of the receipt.*

*After July 1, 2006, the expiration date should not appear at all. Existing POS terminals must comply with these requirements by July 1, 2006. To ensure your POS terminals are properly set up for account number truncation, contact your merchant bank.*

©2006 Visa U.S.A. Inc., all rights reserved, to be used solely for the purpose of providing Visa Card acceptance services as authorized pursuant to agreement with a Visa member financial institution.



Key-entered transactions are fully acceptable, but they are associated with higher fraud and chargebacks rates. In addition, when transactions are key-entered, the benefits associated with special security features—such as the expiration date and Card Verification Value 2 (CVV2)—are not available.

## How to Minimize Key-Entered Transactions

These best practices can help you keep key-entered transactions at acceptably low levels and should be incorporated into your daily operations and staff training and review sessions.

### Pinpoint Areas with High Key-Entry Rates

Calculate the percentage of key-entered transactions compared to total transactions to pinpoint which stores, terminals, or sales associates have high key-entry rates. Merchants are encouraged to monitor their key-entry rates on a monthly basis.

*Many products are available for cleaning magnetic-stripe readers. You can order Visa ReaderCleaner™ cards (VBS - MIM 01.04.03) from Visa Fulfillment at 1-800-VISA-311.*

To obtain the percentage of key-entered transactions for a particular terminal, divide the total number of key-entered transactions by the total number of sales. Exclude from both totals any mail or telephone orders that may have been made at the terminal. Perform the above calculation for each terminal, and for each sales shift to determine the key-entry rate per sales associate. Repeat the process for each store, as appropriate.

### Find Causes and Look for Solutions

If your key-entry rates are greater than one percent per terminal or sales associate, you should investigate the situation and try to find out why. The following chart summarizes the most common reasons for high key-entry rates and provides possible solutions.

| KEY-ENTRY CAUSE | SOLUTION |
|---|---|
| Damaged Magnetic-Stripe Readers | Check magnetic-stripe readers regularly to make sure they are working. |
| Dirty Magnetic-Stripe Readers | Clean magnetic-stripe reader heads several times a year to ensure continued good use. |
| Magnetic-Stripe Reader Obstructions | Remove obstructions near the magnetic-stripe reader. Electric cords or other equipment could prevent a card from being swiped straight through the reader in one easy movement. |
| Spilled Food or Drink | Remove any food or beverages near the magnetic-stripe reader. Falling crumbs or an unexpected spill could soil or damage the machines. |
| Anti-Theft Devices that Damage Magnetic Stripes | Keep magnetic anti-theft deactivation devices away from any counter area where customers might place their cards. These devices can erase a card's magnetic stripe. |
| Improper Card Swiping | • Swipe the card once in one direction, using a quick, smooth motion.<br>• Never swipe a card back and forth.<br>• Never swipe a card at an angle; this may cause a faulty reading. |

©2006 Visa U.S.A. Inc., all rights reserved, to be used solely for the purpose of providing Visa Card acceptance services as authorized pursuant to agreement with a Visa member financial institution.

# Fraud Prevention Guidelines for Card-Not-Present Transactions

Visa has established a range of fraud-prevention policies, guidelines, and services for card-not-present merchants. Using these tools will help protect your business from fraud-related chargebacks and losses. MO/TO and Internet merchants should strongly consider developing in-house fraud control policies and providing appropriate training for their employees.

The following sections outline basic fraud-prevention guidelines and best practices for card-not-present merchants.

## Authorize All Card-Not-Present Transactions

Authorization is required on **all** card-not-present transactions. Card-not-present transactions are considered as zero-floor-limit sales. Authorization should occur before any merchandise is shipped or service performed.

## Ask for Card Expiration Date

Whenever possible, card-not-present merchants should ask customers for their card expiration, or "Good Thru," date and include it in their authorization requests.

Including the date helps to verify that the card and transaction are legitimate. A MO/TO or Internet order containing an invalid or missing expiration date may indicate counterfeit or other unauthorized use.

## Ask for CVV2

The Card Verification Value 2 (CVV2) is a three-digit security number printed on the back of Visa cards to help validate that a customer is in possession of a legitimate card at the time of an order. (See *Visa Card Features and Security Elements* on page 23.)

Studies show that merchants who include CVV2 validation in their authorization procedures for card-not-present transactions can reduce their fraud-related chargebacks.

## CVV2 Processing

To ensure proper CVV2 processing for card-not-present transactions, merchants should:

✔ Ask card-not-present customers for the last three numbers in or beside the signature panel on the back of their Visa cards.

©2006 Visa U.S.A. Inc., all rights reserved, to be used solely for the purpose of providing Visa Card acceptance services as authorized pursuant to agreement with a Visa member financial institution.

| Section 7: | Chargeback Reason Codes |
|---|---|

The chargebacks discussed in this section are grouped into six classifications:

✔ Non-Receipt of Information

✔ Fraud Codes

✔ Authorization Errors

✔ Processing Errors

✔ Cancelled or Returned

✔ Non-Receipt of Goods or Services

©2006 Visa U.S.A. Inc. all rights reserved. to be used solely for the purpose of providing Visa Card acceptance services as authorized pursuant to agreement with a Visa member financial institution.

BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(g) (EXHIBITS) - PAGE 33

# Reason Code 73: Expired Card

| | |
|---|---|
| **Definition** | The card issuer received a transaction that was completed with an expired card and was not authorized. |
| **Most Common Causes** | The merchant accepted a card after its expiration or "Good Thru" date and did not obtain an authorization approval from the card issuer. |

**Merchant Actions**

### Back-Office Staff

**Card Not Expired—Key-Entered Transaction**

(PR) For key-entered transactions, the expiration date should be on the manually imprinted copy of the front of the card. If the expiration date on sales receipt shows the card had not expired at the time of the sale, send a copy of the receipt to your merchant bank. The chargeback is invalid regardless of whether authorization was obtained.

**Card Expired, Authorization Obtained**

(PR) If the card was swiped or a manual imprint made, an authorization approval was obtained as required, inform your bank of the transaction date and amount. Many merchant banks automatically handle this type of chargeback so you never see it.

**Card Expired, No Authorization Obtained**

(NR) If the card is expired and you did not obtain an authorization, accept the chargeback.

### Point-of-Sale Staff

**Check Expiration Date**

(PM) Check the expiration or "Good Thru" date on all cards. A card is valid through the last day of the month shown; for example, if the Good Thru date is 04/08, the card is valid through April 30, 2008 and expires on May 1, 2008.

**Card-Not-Present, Authorization Obtained**

(PR) If the transaction was a MO/TO or Internet transaction, then the expiration date provided by the cardholder is considered correct. Many merchant banks automatically handle this type of chargeback, so you really never see it.

*Merchant Actions Legend:*

*(PR) Possible Remedy  (PM) Preventive Measure  (NR) No Remedy  (CS) Customer Service Suggestion*

©2006 Visa U.S.A. Inc. all rights reserved, to be used solely for the purpose of providing Visa Card acceptance services as authorized pursuant to agreement with a Visa member financial institution.

### Reason Code 73: Expired Card (continued)

#### Always Get Authorization Approval for Expired Cards

(PM) Always request an authorization for transactions on expired cards and submit the expiration date on the card as part of the authorization request. The expiration date is submitted automatically when you swipe a card. If a transaction is not approved, do not complete the sale.

## Owner/Manager

### Check Card Expiration Date

(PM) Periodically remind point-of-sale staff to check the card's expiration date before completing transactions and to always obtain an authorization approval if the card is expired.

©2006 Visa U.S.A. Inc., all rights reserved, to be used solely for the purpose of providing Visa Card acceptance services as authorized pursuant to agreement with a Visa member financial institution.

# Exhibit C

FP-HAND2000





Cards

# American Express

## Fraud Prevention Handbook



BRIEF OF THE UNITED STATES IN SUPPORT OF 15 U.S.C. § 1681c(g) (EXHIBITS) - PAGE 37

# Mail Order, Telephone Order, Internet Order Acceptance Procedures

Since mail, telephone and Internet orders are more susceptible to Card fraud, American Express has designed procedures to help protect the Cardmember and the Service Establishment. By following these procedures, you may prevent a criminal from obtaining merchandise or services at your expense.

When you are accepting an American Express Card for mail, telephone or Internet transactions, obtain the Cardmember's:

1. Name exactly as it appears on the Card
2. Card account number
3. Expiration date on the Card (valid date)
4. Card Identification (CID) number (if your establishment is certified to verify the Card Identification Number)

The CID is a 4-digit number printed above the account number on the face of all American Express Cards. The Card Identification number can help you control fraud:

- The Customer must have the actual Card; carbons and old receipts do not display this number.
- The CID has the advantages of a personal identification number without the problems. Cardmembers don't have to remember a special code; it's printed on the Card.
- Fraud associated with stolen Card numbers is greatly reduced as the CID changes each time a new card is issued.



CID

5. Billing address, and the address where the merchandise is to be shipped, (if different from the billing address)

## Automatic Address Verification (AAV)

In our on-going commitment to help eliminate fraud in the phone and mail order industry, American Express offers Automatic Address Verification (AAV) for American Express transactions. This system electronically transmits your customer's address and zip code to our Cardmember's file. You receive a code indicating a complete, partial, or no-match for each transaction to help you make informed shipping decisions. AAV is free to merchants and qualified third-party processors. For additional information regarding AAV, contact your American Express Account Representative.

6. Billing address phone number and home or business number
7. Phone number where the Cardmember can be reached (if different from the home or business phone)

---

# Mail Order, Telephone Order, Internet Order Acceptance Procedures (continued)

## Additionally:

- If you submit electronically, your electronic Charge Record should indicate "Mail Order," "Phone Order" or "Internet" on the Cardmember billing statement.
- Select shippers that do not allow shipment re-routes.
- If phone/Internet orders are allowed to be picked up at retail locations, require the Card to be presented.

## Authorization Procedures

Call American Express Authorizations at (1-800-528-2121) to verify the billing address and CID. Address verification must be done for charges when merchandise will be shipped. Provide:

- Cardmember account number
- Expiration date
- Name as it appears on the Card
- Cardmember billing address
- Card Identification Number

You will be told "yes" or "no" depending on whether or not the billing address and CID match our files. **Remember that the billing address verification and the CID verification are checks, not guarantees that the charge is legitimate.**



The risk of fraud is greater during transactions where the card is not present. Therefore it is important to follow proper security procedures.

## Mail Order, Telephone Order, Internet Order Acceptance Procedures (continued)

### Reducing Fraud and Chargeback Risk

When the billing address is confirmed but delivery will be to a different address, you help reduce the risk of fraud and chargebacks if you:

- Call back the Cardmember to validate the order. Be sure not to call the phone number received with the order; check the telephone directory, if possible.

- Another way to help control future fraud and chargeback losses is to suppress printing the Card number on the shipping invoice. Instead, you may wish to block out all but the last 4 or 5 digits of the 15-digit Card number (see example – Information Protection, p.9). Additionally, never print the CID number on the shipping invoice.

- Be wary of situations where someone places a telephone order, then sends someone (who does not present the Card) to pick up the merchandise.

- Do not accept a fax of the Card as a valid presentation.

- If transactions are done via the Internet, ensure that sites are secured for electronic commerce with the main emphasis of protecting unauthorized access to the customer card information (e.g., behind a firewall). Transactions should be conducted using browser software that supports industry-standard encryption protocols. Passwords to Merchant Web sites should be changed regularly and never set to default.

**Reminders:**

- If you fulfill an order more than 30 days after the original authorization, call again for a new approval code before mailing the merchandise.

- Charges cannot be submitted for payment until the merchandise is shipped.



As Internet orders become more commonplace, it is important that your procedures include a thorough check of each customer.

## Information Protection/Data Security

As an American Express merchant, you are responsible for helping to ensure that your customer's credit card information is secured and protected against future fraud activity. Here are a few steps that you can take to protect this information:

1. Customer's credit card information should be kept confidential. Any electronically stored Cardmember information should be encrypted and/or password protected. (Consult your Terminal Provider or local software specialty store for assistance.)

2. Store your daily credit card receipts in a secured area and limit access to this information to personnel that need this information for accounting and customer service purposes only.

3. Credit card information that is discarded should be shredded or destroyed. Always destroy unneeded carbon copies of charge forms, lodging portfolios or car rental agreements to prevent misuse of valuable Cardmember information.

4. Do not print the Card expiration date or your merchant account number on the terminal (customer) receipt. Only print a "subset" of the Card account numbers on the terminal (customer) receipt.

5. Only your terminal provider or Helpdesk Representative should make changes or upgrades to your Point of Sale equipment and transmission lines.

6. Monitor behavior and activities of employees, especially in transactions where the Card is out of the customer's possession. Ensure that portable and hand held card reading/capturing devices are not being used by employees to capture card data. Be wary of a "contact person" that shows up regularly to meet with an employee to drop off/pick up a scanner, or to pay off an employee for data that has been collected.



Only print a "subset" of the Card account number on the receipt.

# Exhibit D



Register to Use
Discovernetwork.com
About Us
Help & FAQs
General FAQs
Reporting FAQs
Submission Error Fees
FAQs
Internet FAQs
Rules and Regulations
Fraud Prevention
Fraud Prevention FAQs
System Requirements
Account Activation
Gift Card FAQs
Online Advertising FAQs
Automatic Payments
FAQs
Privacy
Contact Us
Site Map
Terms of Use
Discover Network
Acceptance Mark -
Guidelines and Logos

# Help Topics

## Fraud Prevention - Ask The Expert (FAQs)

1. How can I prevent fraud?
2. How can I prevent Internet, Mail-Order (MO) and Telephone-Order (TO) fraud?
3. Why should I require CID on my Web site?
4. Why should I require a signature when delivering mail or telephone orders?
5. Why is data security so important and how can I protect my business and customers from hacking attacks?
6. Where can I report suspected Merchant Fraud?
7. Where can I meet other Merchants that may have the same Card Not Present (CNP) fraud concerns that I have?
8. What are some signs of suspicious behavior?
9. What do I do if I suspect a Card is fraudulent in a Card Present situation?
10. What are some tools offered by Discover Network to help prevent fraud?

**1. How can I prevent fraud?**
There isn't a single simple solution or tool to preventing fraud. It takes an assortment of many tools to prevent fraud. The best protection comes from knowledge and understanding of the latest tools and trends impacting the marketplace. Discover Network offers its Merchants numerous tools to assist in the fight against fraud. Reading through the FAQs listed below will help you determine what your business needs to do to reduce your fraud risk. Awareness is the first step towards fighting fraud!

**2. How can I prevent Internet, Mail-Order (MO) and Telephone-Order (TO) fraud?**
Here are some guidelines for preventing Internet and MO/TO fraud:

**Request Cardholders for the following information during the order taking process:**

- Cardmember Name, exactly how their name appears on their Discover® Network-issued card
- Card Account Number is at least 16 digits
- Card Expiration Date, four-digit number MM/YY
- CID (Card Identification Data), the three-digit number located on the back of the card in the signature panel
- Card billing address along with the ship-to address (when necessary)
- Home, business or other telephone number where the Cardmember can be reached

**For each transaction, be sure to:**

- Request and validate the Card Identification Data (CID) (the three-digit code on the back of the card in the signature panel). The CID can be submitted in the electronic authorization request or can be used when calling our authorization center
- Verify the customer's billing address, either electronically or by our automated

# Exhibit E



HOME | MERCHANT ACCOUNT CENTER ▾ | START ACCEPTING ▾ | MERCHANT RESOURCES ▾

- Merchant Resources Home
- Order Signage & Supplies
- Fraud Prevention

Card Present
Card Not Present
Discover Network Security Features
Internet and Protecting Customer Information
Internet Fraud Alert
Abbreviated Numbers
Fraud Prevention Supplies
Ask the Expert (FAQs)
- Data Security
- Discover Network Gift Card Products
- Payroll Cards
- Contactless Payments
- Biometrics
- Merchant Offers
- Online Advertising
- Automatic Payments
- Change Your Bank Account Information
- Rules and Regulations
- Activate Your Terminal / POS Device
- Transaction Processors

# Fraud Prevention

## Card Not Present

In any situation where a card is not present and you are unable to complete a face-to-face transaction, the opportunity for fraud increases.

**Card Not Present (CNP)** transactions have become the foundation for commerce over the Internet in addition to mail order and telephone order businesses. To assist your company in reducing fraud exposure, these helpful tips have been developed for Discover® Network Merchants who are doing business in a CNP environment.

- Authorization Center
- Helpful Hints to Reduce Chargebacks and Risks
- Types of Suspicious Behavior

**Authorization Center**

To obtain an authorization or address verification, or to question the validity of a Discover® Network Issued Credit Card, please call **1-800-347-1111**.

**Helpful Hints to Reduce Chargebacks and Risks**

- Request and validate the Card Identification Data (CID) (the three-digit code on the back of the card in the signature panel). The CID can be submitted in the electronic authorization request or can be used when calling our authorization center
- Verify the customer's billing address, either electronically or by our automated phone system (Address Verification System - AVS)
- Check your delivery service contract for who is responsible for merchandise not delivered
- Get a signature for each delivery
- Keep all delivery records
- All declines are final. Do not force through any sales for which you have received any declined response to your authorization request
- If the sale is on a credit card, do not refund in cash or by check. Refund sales on the same card account that the purchase was made on
- Include your common DBA and customer service number on the Cardholder's transaction statement
- Clearly communicate any and all delivery charges, restocking or other fees
- Clearly explain any return policies and offer documentation of this policy with each sale
- When working on a chargeback, document efforts to satisfy the customer
- Respond to all Chargebacks, even the small ones (remember, this is your customer)
- Duplicate charges, or installment plans, unless otherwise stated, require an authorization for each sale

**Types of Suspicious Behavior**
Please consider that these are only indicators of higher risk transactions. One behavior

alone may not be a concern.

- New customer attempts to make a very large credit card transaction
- Customer doesn't know the Card Identification Data (CID) found on the back of the Card, indicating that they don't have the actual Card
- Customer's address does not match when attaining an Address Verification
- Shipping to an address other than the billing address
- Customer asks that you try lower dollar amounts when a decline message is received
- Customer instructs you to try different expiration dates when initial attempts fail
- Customer hesitates, or has a long pause, when asked for personal information
- Customer repeatedly sends e-mail messages requesting confirmation of shipment
- Customer attempts to place multiple orders to the same address
- Customer attempts to purchase large quantities of a single item
- Customer purchases several large-ticket items, which do not go together, e.g., appear random
- Customer calls a few minutes before closing and wants several large-ticket items
- Customer requests that sales be split up to avoid paying "import taxes" and/or "duty fees"
- Customer requests shipment to an overseas destination
- Customer seems overly concerned about delivery time frames to overseas destinations
- Customer attempts to place a large order using several credit cards to obtain the total authorization amount
- Customer offers the phone number to an authorization center to speed up the credit card approval process
- Customer has little regard for price
- Customer shows little or no concern for return policies, manufacturer warranties and/or rebates when purchasing in large quantities

*Please refer to your Discover Network Merchant Operating Regulations for further Card Not Present (CNP) requirements with respect to the submission of sales.

If there is a breach in your system, notify Discover® Network Security within 48 hours at 1-800-347-3083.

Click here to learn more about our Data Security guidelines and our DISC program.

For more extensive information on fraud prevention, including identifying the Discover Card brand, handling suspicious situations, and recovering lost or stolen cards, please consult your Discover Network Merchant Operating Regulations.

In our efforts to assist our Merchants that conduct e-commerce transactions, Discover Network is a proud sponsor of the Merchant Risk Council. Learn more.

Fraud Prevention Supplies

Back to Top

Register    About Us    Terms of Use    Privacy    Help & FAQs    Contact Us    Site Map

© 2007 DFS Services LLC